UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIM. NO. 3:19CR208 (AWT) |
| | : | |
| v. | : | |
| | : | |
| MEMET BEQIRI | : | APRIL 28, 2020 |

GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The Government respectfully submits this memorandum in support of the sentencing of

the defendant, Memet Beqiri, for criminal conduct involving the making and using false

documents, in violation of 18 U.S.C. § 1001(a)(3) and aiding and abetting, in violation of 18

U.S.C. § 2. Beqiri, as the owner and manager of New England Meat Packing, L.L.C., a federally

inspected facility that operates in Stafford Springs, Connecticut, is responsible for the slaughter

and processing of livestock to include sheep, goat, beef and lamb. The establishment is subject to

federally required testing to provide assurance that its meat products are safe for human

consumption. In this case, 54 falsified laboratory reports represented that the goat carcass and

ground beef samples processed in his meat packing company tested negatively for the presence of

*Escherichia coli* ("*E.coli*"), when in truth and fact, the samples were never tested. The defendant's

actions, which were based on his belief that taking the samples to a certified laboratory for testing

was, in his own words, an "inconvenience and a nuisance", put consumer health at significant and

extremely serious risk, specifically with regard to a falsified ground beef sample that was

purportedly tested for the presence of *E.coli* O157:H7, an adulterant in raw, non-intact beef

products per the Federal Meat Inspection Act ("FMIA"), 21 U.S.C. § 601(m)(1). As a result, for

the reasons stated below, the Government requests that the Court impose a fair and reasonable

sentence, in light of the sentencing factors articulated in 18 U.S.C. § 3553(a), that reflects the

1

seriousness of the criminal conduct, but is not greater than necessary to achieve the purposes of sentencing.

## I.    **Procedural Background**

On August 20, 2019, the defendant appeared before this Court, waived indictment, and pled guilty to an Information charging him with making and using a false document and aiding and abetting, in violation of 18 U.S.C. §§ 1001(a)(3) and (2).  PSR face sheet, ¶ 1.  The defendant faces a maximum penalty of five (5) years of imprisonment, a maximum period of supervised release of three (3) years, a maximum fine of $250,000, and a $100 mandatory special assessment.[1] PSR face sheet and ¶¶ 62, 65, 69-70.  The defendant's Sentencing Guidelines are calculated pursuant to U.S.S.G. § 2B1.1 and begin at a base offense level of six (6).  U.S.S.G. § 2B1.1(a)(2), PSR ¶ 21.  There is no loss amount attributable to the defendant.  The PSR has determined that pursuant to the specific offense characteristic outlined in U.S.S.G. § 2B1.1(b)(16)(A), that the offense involved a conscious or reckless risk of death or serious bodily injury, increasing the offense level to 14. PSR ¶ 22.  The defendant disputes this increase.  With two (2) levels subtracted for acceptance of responsibility pursuant to U.S.S.G. § 3E.1.1, the adjusted offense level is 12. PSR ¶ 29.

The PSR has calculated the defendant's criminal history category at I, as while he has been arrested on two occasions when he was in his 20's, he has no known criminal convictions.  PSR ¶¶ 33, 36-37.

The resulting correctly calculated Sentencing Guideline range is 10 to 16 months of imprisonment.  PSR ¶ 63.  Probation is not authorized under the Guidelines as the applicable Guideline range falls within Zone C of the Sentencing Table.  U.S.S.G. §5B1.1(b)(1), comment. (n.2), PSR ¶ 68.  The applicable fine range is from $5,500 to $55,000 pursuant to U.S.S.G.

---

[1] The plea agreement incorrectly stated that the maximum fine was $1,000,000.

§ 5E1.2(c)(3). PSR ¶ 71. The defendant is also subject to a period of supervised release of one (1) to three (3) years consistent with U.S.S.G. § 5D1.2(a)(1)(a)(2) and there is a mandatory $100 special assessment pursuant to 18 U.S.C. § 3013. PSR ¶¶ 66, 70.

## II.    Background

New England Meat Packing, L.L.C. ("N.E. Meat") is a family owned business located at 30 Furnace Hollow Road, Stafford Springs, Connecticut 06076. The company has been operating five days a week since June of 2005, and is a domestic limited liability company that is currently authorized, through a grant of inspection issued by the United States Department of Agriculture, ("USDA"), Food Safety and Inspection Service ("FSIS"), to slaughter and process beef, veal, goat and lamb. Between November 3, 2016 and September 9, 2017, the timeframe charged in the indictment, defendant Memet Beqiri was, and continues to be, the President and General Manager of N.E. Meat, having taken over from his father in approximately 2015. PSR ¶ 7. Defendant Debbie Smith, the Hazard Analysis and Critical Control Point ("HACCP") Coordinator during the timeframe charged in the indictment, is no longer employed by the Company. [2] *See United States v. Debbie L. Smith*, 3:19CR236 (AWT), related to the instant matter.

1.   Relevant Statutes, Regulations, and Company History

The Federal Meat Inspection Act ("FMIA") was enacted in June of 1906, when Congress recognized that "[i]t is essential in the public interest that the health and welfare of consumers be protected by assuring that meat and meat food products distributed to them are wholesome, not adulterated, and properly marked, labeled and packaged." 21 U.S.C. § 602. The FMIA established four major sanitary requirements for the meat packing industry to include: (1) mandatory

---

[2] The cases are related as both defendants pleaded guilty to an Information and were initially assigned different docket numbers and different Judges before a Notice of Related Case resulted in the transfer of defendant Smith's case to this Court.

inspection of livestock before slaughter; (2) mandatory postmortem inspection of every carcass; (3) explicit sanitary standards for slaughterhouses; and (4) the Act permitted the USDA to issue grants of inspection to monitor slaughter and processing operations, enabling the Department to enforce food safety regulatory requirements.  21 U.S.C. § 603, et. seq.

For more than 90 years, meat inspection was based on organoleptic methods, using sight, touch and smell.  But, in 1993, a deadly outbreak of the *E.coli* O157:H7 bacterium strain signaled the need for greater controls based on science to prevent foodborne illness and protect consumers. The FSIS division of the USDA began a sampling program to test for this pathogen in federally inspected establishments and retail stores.  FSIS is responsible for ensuring that meat, poultry and processed egg products are safe, wholesome, and accurately labeled.  Within the FSIS, the Office of Investigation, Enforcement and Audit ("OIEA") conducts surveillance, investigation, and enforcement activities to promote these measures.  It is recognized that the programs administered by FSIS and OIEA have proven highly effective in containing *E.coli* contamination.

Federal regulations enacted under the FMIA require that certain meat processors enact a plan for addressing food safety hazards which may cause meat to be unsafe for human consumption.  The plan is called a Hazard Analysis Critical Control Point ("HACCP") plan and must be approved by the USDA FSIS before a meat processor can legally engage in business. Once approved, the FSIS then monitors compliance with the HACCP regulations on a continuing basis.

N.E. Meat's HACCP plan in effect in 2016-2017, the relevant time frame in this case, was approved in February of 2014.  While their physical plant is characterized as a small to medium size facility, because they serve clients requiring custom Halal and other specialty meats and are one of a small number of specialty meat packing companies in the northeastern United States catering to this client, their volume relating to the religious (Halal) slaughter and processing of

livestock, to include beef, goat, sheep and lamb, is significant. For example, 32,480 livestock were slaughtered between June 1, 2016 and May 31, 2017, and of that number, 20,734 of the animals slaughtered were goats. *See* Food Safety Assessment for N.E. Meat drafted by the USDA FSIS OFO, dated November 29, 2017 ("FSA")[3]. As required by the USDA FSIS' regulations, FSIS inspectors maintain offices on site at N.E. Meat to enable them to review the myriad aspects of documentation and testing requirements to ensure HACCP compliance. FSIS additionally supplements the HACCP testing through the Government's own national initiatives to ensure and regulate health and safety measures in all federally-inspected meat, poultry, and processed egg facilities around the country.

Part 310.25 of Title 9 of the Code of Federal Regulations mandates N.E. Meat to sample and test for *E.coli* Biotype I ("*generic E.coli*") at a rate of one carcass per 300 (or, at a minimum of one carcass sample per week) of the type of livestock slaughtered in the greatest number-- in this case, goats. Additionally, by the terms and design of their own approved HACCP plan, N.E. Meat is required to sample and test ground beef quarterly for *E.coli* O157:H7, an adulterant in raw, non-intact beef. The sampling and testing procedures were included in N.E. Meat's HACCP plan because the HACCP regulations promulgated, per the FMIA mandate, that meat processors must conduct ongoing verification activities to ensure control of known and identified hazards in the slaughter process. *See* 9 C.F.R. § 417.4(a)(2) (identifying that "every establishment…shall verify that the plan is being effectively implemented" and that "[o]ngoing verification activities include, *but are not limited to*" activities enumerated herein) (emphasis added).

Testing per the HACCP plan involves submission of samples to a certified microbiological laboratory for analysis. Falsification of *E.coli* O157:H7 laboratory analysis results in connection

---

[3] For brevity, the 30-page FSA, which was provided to the defendant as a part of the discovery in this case, is not attached to this filing, but is available for the Court's review, if desired.

with ground beef testing done pursuant to an approved HACCP plan directly affects the ability to enforce the FMIA. This is because the USDA relies on the laboratory results as support demonstrating that the establishment's food safety system is working as intended and designed to prevent carcass contamination with pathogens that are of concern to public health. Ground, or otherwise non-intact beef contaminated with *E.coli* O157:H7 is considered adulterated per the FMIA, 21 U.S.C. § 601(m) (1). Additionally, the laboratory results determine whether the beef is safe, wholesome and unadulterated, such that the release of the beef for sale to the public is safe or that a prohibition of release is required to protect human health and safety, and/or if other enforcement measures are required. *See* 76 Fed. Reg. 58157, 58157-58 (Sept. 20. 2011)(stating that since the 1990's, FSIS has considered *E.col*i 0157H7 to be an adulterant of raw, non-intact beef products and the raw intact components used to manufacture these products). Pursuant to 9 C.F.R. § 417.2(a)(1), an establishment is required to conduct a hazard analysis, identify hazards reasonably and not reasonably likely to occur, and identify the preventive measures to control identified hazards, as well as to maintain all supporting documentation for decisions made in their hazard analysis in accordance with 9 C.F.R. § 417.5.

Goat meat carcass samples are tested for a different reason in that the purpose of the testing is focused on providing information as to the sanitary conditions of the physical plant, employee hygiene, and the equipment used in the slaughter and processing of the animals. Further, as noted above, this sampling is a regulatory requirement per 9 C.F.R. § 310.25. The test results obtained from goat carcass samples are analyzed quantitatively, providing results on actual levels of the bacterium present in the sample (versus qualitative analysis resulting in results of presence or absence). If a result is received for generic *E.coli* on a goat carcass that exceeds established limits for the presence of bacterium, the company would then be required to evaluate process control and sanitation issues. However, if the plant and equipment were found to be unsanitary in any respect,

it is possible that more significant issues, with regard to all meat species, are of concern.

Since approximately 2012, N.E. Meats utilized the services of Vallid Laboratories, Inc., located in Agawam, Massachusetts, and run by Ms. Debra Vallides, President. Vallid Labs, contracted privately by N.E. Meat, performed testing of ground beef, bovine carcass swabs and caprine carcass swabs in support of USDA FSIS' food safety program and the firm's own HACCP plan. Upon completion, results were sent to N.E. Meats in a PDF document, via email, which to the best of Ms. Vallides' knowledge, was accessed by defendant Memet Beqiri, owner of the company, and Debbie Smith, the company's HACCP coordinator.

In mid-September 2017, Ms. Vallides contacted the USDA's front line supervisor who oversees the USDA inspectors assigned to inspect and oversee operations at N.E. Meat, to inquire as to whether N.E. meat was using a different lab to conduct *E.coli* testing. Ms. Vallides made this inquiry as few samples had been submitted by the company during the 2017 calendar year and she was concerned that N.E. Meats was not fulfilling their regulatory *E.coli* sampling requirements. More specifically, Ms. Vallides advised that during 2017, she had only received ten sample submissions from N.E. Meat with corresponding report dates ranging from March 5, 2017 through August 6, 2017.

When the USDA supervisor conducted a review of N.E. Meat's filed laboratory reports stored in the company's sample log books, he then inquired of Ms. Vallides as to caprine carcass swab lab samples for approximately 27 identified dates in 2017, one ovine carcass swab with a report dated September 9, 2017, and as one ground beef *E.coli* lab O157:H7 laboratory sample report dated March 27, 2017, showing her 29 reports. Ms. Vallides responded that the reports were not generated by her laboratory although the reports contained her laboratory letterhead and her signature. Her conclusion was supported by the fact that the numbering on the reports were not consistent with the sequential numbering system she uses at Vallides Laboratory, that the

samples were not logged into her data base and there was no chain of custody records, as is her standard procedure. Ms. Vallides confirmed that she did not receive, test or provide reports for those 29 samples that bore her name. Ms. Vallides surmised that the records were false and fabricated, as were any other reports bearing dates that were not identified in her computer system.

2. Defendant Smith's Duties and Account of Pertinent Events

For the period of time that defendant Smith was employed by N.E. Meats as the HACCP coordinator, her duties included collection of the sample swabs of beef, lamb and goat carcasses, as well as samples of ground beef products for the purpose of *E.coli* testing. For the first two years of her employment, defendant Smith stated that she would take the swabs to Vallid Labs in Agawam, Massachusetts in her personal vehicle, following regular business hours, and would receive $10 in gas money from either defendant Beqiri or his father. Smith PSR ¶ 17. However, in approximately August of 2016, defendant Smith stated that she stopped delivering the *E.coli* sample swabs to Vallid Labs as she stated that she was tired of doing it on her own time. *Id.* Instead, she placed the swabs in the cooler at the plant. *Id.* Defendant Smith stated that sometimes she would come to work the next day and find that the swabs were still in the cooler. *Id.* When that occurred, she told defendant Beqiri and while initially he or someone else would take the samples to the laboratory, beginning in September of 2016, she observed that no one was taking the samples to the laboratory for testing. *Id.*

Defendant Smith stated in her interview conducted by FSIS OIEA Investigator Froehlich on August 8, 2018, that was reiterated in her PSR:

> There came a time in September 2016 when nobody took the Caprine Carcass Swabs that I collected to Vallid Labs for E.Coli testing. At this point, Matt [Memet Beqiri] told me to find a way to convert an Adobe PDF file, one that we received which contained an authentic Vallid Labs, Inc. letterhead and E.Coli Sample Result, to a Microsoft Word document so that we could manipulate it. I utilized Adobe Pro and did this at Matt's request during the course of a regular business day. Once I was able to

create a false and fictitious sample result, Matt told me to just make up a sample number and make it look like we sent the samples and received the results.

Smith PSR ¶ 17.

Defendant Smith additionally outlined in her August 8, 2018 statement to Investigator Froehlich:

> I did all of this because I felt Matt expected me to do this and nobody was taking the samples I collected to the lab. I felt if I refused to create these false reports that I would lose my job. I knew that if any employee here would refuse to do something Matt would let them go. There was nobody else at New England Meat Packing, LLC that helped me create these false lab reports or was involved in any other way except for the owner, Matt Beqiri telling me to "just take care of it." And I knew that to mean that I was to continue to create the numerous false lab reports.

Smith PSR ¶ 17.

### 3. Defendant Beqiri's Account of Pertinent Events

Defendant Memet Beqiri, owner of N.E. Meats, was initially interviewed on September 26, 2017 and again on November 7, 2017, by FSIS OIEA Investigator John Froehlich. PSR ¶¶ 12-13. The interviews related to the authenticity of the laboratory samples for generic *E.coli* testing on caprine carcass swabs on the 27 identified dates, as well as one test for *E.coli* O157:H7 with a reported date of March 27, 2017, and the ovine carcass swab report dated September 9, 2017. These laboratory sample reports were all contained in the Laboratory Sample Report binder maintained by N.E. Meat for routine inspection by the USDA, FSIS. *Id.* Defendant Beqiri advised that N.E. Meat would normally send the samples to Vallid Labs in Agawam, Massachusetts and that the company had been using the laboratory for at least the last five years. *Id.* Upon questioning, defendant Beqiri admitted that the 29 reports in his company binder containing were fabricated as never actually collected or submitted for required testing at Vallid Labs.

PSR ¶¶ 10-12. Defendant Beqiri stated:

I used a previously received Vallid Labs, Inc. letterhead, without their knowledge, and created "negative" Generic E.Coli and E.Coli 0157:H7 sample reports for samples that were never submitted. My firm produced the fictitious sample results documents on our computer, printed them off and placed these reports in our Lab Sample binder. We presented these sample results to all the USDA FSIS OFO Inspection Personnel assigned to our plant as being a true and accurate representation of our sampling program, although they were not.

Through miscommunications with my HACCP/QA coordinator and in an attempt to create the appearance to USDA FSIS OFO officials that I was compliant with all testing requirements under my HACCP plan, I reluctantly created these false reports. I didn't correlate the potential impact on food safety with our sampling program.

Statement of Memet Beqiri, Owner, N. E. Meat, dated September 4, 2017.

On November 7, 2017, defendant Beqiri provided a second statement to FSIS Investigator Froehlich, relating to seven additional fraudulent lab test reports that had been identified by FSIS, again stating that he utilized a previously received Vallid Labs, Inc. letterhead, without their knowledge. On this occasion, the defendant stated,

**"the reason for our firm not collecting and submitting all these required samples was simply because we considered it an inconvenience and a nuisance**." (emphasis added).

PSR ¶ 13.

During his change of plea colloquy on August 20, 2019, defendant Beqiri admitted in the Stipulation of Offense conduct that he "authorized" the preparation and submission of the reports that were in the company's Lab Sample Binder. In the Presentence Investigation Report ("PSR") prepared in this case, the defendant stated that he made a mistake in trusting defendant Smith, the HACCP coordinator with taking the samples to the lab to get tested. PSR ¶ 18. He stated that "she forged the initial certificate and once he found out about it he did not do anything to stop it. Mr. Beqiri said that instead of stopping it he allowed it to continue." *Id.*

In his Memorandum in Aid of Sentencing, defendant Beqiri references his actions, stating:

When Mr. Beqiri became aware that his quality control officer and co-

defendant, Ms. Smith, had discarded the carcass swabs in the refrigerator at New England Meat Packing and that she had failed to submit them for testing for either generic E.Coli or non-generic E.Coli, Mr. Beqiri should have acted more responsibly. Instead of taking control to remedy the situation by immediately delivering the samples to the lab, he did nothing, thereby becoming complicit in the creation and use of false documents by Ms. Smith during the period from November 3, 2016 to September 9, 2017.

Defendant's Memorandum in Aid of Sentencing at 20.

The defendant has thus gone from stating that he authorized the false sample reports to saying that defendant Smith forged the certificates and he did nothing to stop her. The offense conduct details provided by defendant Beqiri and defendant Smith remain completely inconsistent.

## III.   <u>Sentencing Parameters</u>

Title 18, United States Code, § 3553(a) provides that the "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection" and then sets forth seven specific considerations:

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     the need for the sentence imposed –

(A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)  to afford adequate deterrence to criminal conduct;

(C)  to protect the public from further crimes of the defendant; and

(D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)     the kinds of sentences available;

(4)     the kinds of sentence and the sentencing range established [in the Sentencing Guidelines];

(5)     any pertinent policy statement [issued by the Sentencing Commission];

(6)     the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)     the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

To implement this section, and the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the Second Circuit has explained that district courts should engage in a three-step sentencing procedure. *United States v. Crosby*, 397 F.3d 103, 112-13 (2d Cir. 2005); *see also United States v. Fernandez*, 443 F.3d 19, 26 (2d Cir. 2006). First, the district court must determine the applicable Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to a determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Crosby*, 397 F.3d at 112. Second, the district court should consider whether a departure from the Guidelines range is appropriate. *Id.* Third, the court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose. *Id.* at 112-13.

## IV.     **Argument**

1. *E.coli* Contamination

Our country's high quality standards in the food industry allow us the freedom to enjoy our meals without the concern that we may be inviting illness with each bite. While good health demands that we be prudent in our food selection and preparation decisions, we rely on food manufacturers and processing plants as the first line of defense against dangerous and potentially lethal pathogens in our food supply. To this end, as previously outlined, federal regulations require meat processing plants to develop a HACCP plan to identify and address hazards and risks inherent in the food production process. As the owner and manager of a meat processing plant, defendant Beqiri played a vitally important role: reviewing and monitoring the company's

plan to safeguard against contamination of its food products. Cutting corners by falsifying

required documents was not only unlawful; it was also callous and reckless.

Regardless of whose version of the events is accurate, the defendant, as owner of N.E.

Meats, bore full responsibility for the fraudulent laboratory reports that were placed in his

business' binder for review by the FSIS. The seriousness of defendant's conduct cannot be

overstated in that the defendant's recklessness created a serious potential threat to public health

that he clearly either did not appreciate or does not want to admit that he understood. A full

appreciation of the risks caused by defendant's fraudulent conduct starts with a general

understanding of the symptoms and complications of an *E.coli* infection and the reach of the

prevalence of *E.coli's* presence in the United States.

Broadly recognized for its harmful effects, *E.coli* has become one of the most infamous

foodborne pathogens in this country. The symptoms associated with *E.coli*, specifically, Shiga

toxin-producing *E.coli* ("STEC") such as *E.coli* O157:H7, include severe stomach cramps,

diarrhea (often bloody), vomiting, nausea, and fatigue.[4] Even worse, an estimated 5-10% of

those who are diagnosed with a STEC infection develop a complication known as hemolytic

uremic syndrome, which can lead to kidney failure and result in lifelong complications or death.[5]

In addition to being one of the most widely known foodborne pathogens, *E.coli* is also one of the

most common.[6] In 2012, the CDC estimated that 265,000 STEC infections occur each year in

---

[4] Centers for Disease Control and Prevention ("CDC"), *E.coli* General Information. http:
www.cdc.gov/ecoli/general/index.html; U.S. Department of Health and Human Services,
National Institute of Allergy and Infectious Disease, *E.coli* Symptoms,
http://www.niaid.nih.gov/topics/ecoli/Pages/Symptoms.aspx

[5] CDC, *E.coli* General Information, http://www.cdc.gov/ecoli/general/index.html; HHS-NIAID,
*E. coli*

[6] See U.S. Food and Drug Administration, Food Safety for Momsto-Be: Medical Professionals –
Foodborne Pathogens, Top 14 Foodborne Pathogens, in the United States,
http://www.cdc.gov/foodborneburden/2011-

the United States and that approximately 36% of those infections are caused by *E.coli* O157:H7, the same strain at issue in this case.[7]  Combatting the risk of *E.coli* contamination in the food supply and the incidence of STEC infection starts at the food source and demands careful consideration of how to reduce contamination in processing plants like N.E. Meat.

As the owner of N.E. Meat, the defendant understood this and was in a unique position to prevent the spread of *E.coli* contamination.  As outlined above, *E.coli* O157:H7 contamination is a serious threat to public health.  Defendant Beqiri was aware of that risk and disregarded public health.  The falsification of the required documents that were mandated pursuant to N.E. Meat's own HACCP plan, stating that the meat sample had tested negative for *E.coli* when, at best, it was never sent to the laboratory, and at worst, was actually contaminated with *E.coli* O157:H7.  Further, falsification of 28 other laboratory reports for generic *E.coli* indicates that the defendant failed to comply with FSIS regulatory requirements for monitoring process control in accordance with 9 C.F.R. § 310.25(a).  Thus, the absence of accurate test results indicates that all species of livestock being slaughtered and processed at the establishment could be contaminated with feces, a known source of STEC and other pathogens of public health significance (e.g. salmonella), or subject to other unsanitary processes during slaughter operations (e.g. unclean equipment, poor employee hygiene).

    2.    <u>The Offense Conduct in this Case Warrants an Increase Pursuant to U.S.S.G. § 2B1.1(b)(16)(A) as the Offense Involved a Conscious or Reckless Risk of Death or Serious Bodily Injury.</u>

---

foodborneestimates.html; Academy of Nutrition and Dietetics, Most Common Foodborne Pathogens, http://<u>www.eatright.org/resource/homefoodsafety/safety--tips/food-poisoning/most common-foodborne-pathogens</u>

[7] HHS-NIAID, *E. coli* Overview, http://www.niaid.nih.gov/topics/ ecoli/Pages/overview.aspx.

Defendant Beqiri opposes the U.S.S.G. § 2B1.1(b)(16)(A) specific offense characteristic increase attributed to him in the PSR as he claims that the facts of this case do not support the increase for three reasons outlined in his Sentencing Memorandum. Defendant's Memorandum ("Def. Memo") at 7-18. These reasons are all based, in significant portion, on the FSIS Food Safety Assessment for N.E. Meat and include: (1) that the FSIS assessment addressing N.E. Meat's failure to conduct the quarterly test for ground beef required in their HACCP plan does not support a correlation with a risk to the public; (2) N.E. Meat had control over measures designed to prevent the contamination of ground beef that the FSIS assessment describes as effective; and (3) that the one fraudulent submitted test for ground beef, even if it was positive, does not support attribution of the specific offense characteristic. Def. Memo at 7-8. The Government completely disagrees with the defendant's reasoning, asserting that the increase is fully supported by a preponderance of the evidence standard of proof.

     a.   Relevant Case Law

As previously noted, one single contaminated piece of ground beef would be sufficient to cause someone, particularly an elderly individual, an infant or someone with a compromised immune system, a significant risk of death or serious bodily injury. And contrary to the defendant's representation, case law supports this premise.

As a general rule, to support a Sentencing Guideline increase pursuant to U.S.S.G. § 2B1.1(b)(16)(A), the conduct at issue must create a risk that others might suffer serious bodily injury, but the defendant does not have to subjectively appreciate this fact. *United States v. Lucien*, 347 F.3d 45 (2d Cir. 2003). Additionally, it does not have to be absolutely certain that the conduct would have resulted in bodily injury. *United States v. Thorsted*, 439 Fed. Appx. 580, 582 (9th Cir. 2011)("Only 'some' evidence that the conduct created a risk of serious bodily injury is required.")(quoting *United States v. Awad*, 551 F.3d 930, 941 (9th . Cir. 2009); *United States v.*

*W. Coast Aluminum Heat Treating Co.*, 265 F.3d 986, 993 (9th . Cir. 2001)("A district court does not abuse its discretion in applying [§ 2B1.1(b)(16)] when the defendant has acted in conscious disregard of a known risk of serious bodily injury even if the ultimate probability of occurrence is found to be relatively low.").

The case of *United States v. Maestas* is analogous to N.E. Meat. 642 F.3d 1315 (10th Cir. 2011). In *Maestas*, the defendant attempted to steal a piece of gold that was contaminated with plutonium from the Los Alamos National Laboratory. *Id.* at 1316. The defendant was apprehended before he left the facility and the contaminated gold was not introduced to the public. *Id.* On appeal to the Tenth Circuit, the defendant argued that the Government needed to prove that he was aware of the risk that his conduct created and challenged the district court's factual findings that the gold was dangerous and that he was aware of the danger. *Id.* The risk of injury created by the defendant's actions was, therefore, alleged to be tenuous. And in fact, the evidence presented by the Government showed that a person who merely touched the gold would not be at risk as plutonium is only hazardous when inhaled, ingested or passed through the blood stream. *Id.* at 1318. The Government's expert concluded that the "health risks of processing the gold were unclear." *Id.*

The Tenth Circuit, however, joined the Second and Ninth Circuits, holding that "the government does not have to prove that the defendant was actually aware of the risk of serious bodily injury." *Maestas* at 1321. The Court also concluded that the district court's finding that the gold posed a danger of serious bodily injury, despite the "unclear nature of the risk, was not erroneous. *Id.* at 1322. (The Government need not show that serious bodily injury was certain or even highly likely to occur; it just only show that there was a risk that it would occur."). It was, therefore, reasonable for the district court to infer that the defendant understood the dangers of radiation and that he was aware that this specific piece was radioactive. Mirroring the facts of this

case, *Maestas* demonstrates that a single instance of conduct with unclear risk is sufficient to support a § 2B1.1(b)(16) specific offense characteristic increase.

The Second Circuit case of *United States v. Wolosz*, 485 Fed. Appx. 509, 514 (2d Cir. 2012) further supports this premise. In *Wolosz*, the defendants paid an individual to intimidate and assault the plaintiffs, including by pouring acid on the girlfriend of one of the plaintiffs. The Court held that it was irrelevant whether the defendant could have "foreseen the specific consequences that resulted from his actions, namely that acid would be poured on a plaintiff's girlfriend, because he "indisputably hired someone to inflict violence for the purpose of intimidating his workers and obtaining a favorable money settlement of their claims." *Id.* And in *United States v. Rigo*, 13CR897 (RWS), 2015 WL 2240309 at *3 (S.D.N.Y. 2015)*, defendants who had trafficked in second-hand prescription medications and ultimately caused insurers to pay for them under false pretenses, were subject to the U.S.S.G. § 2B2.1(b)(16) increase. The enhancement was applied "as second-hand drugs were re-dispensed and then sold as new, which placed anyone taking those drugs at risk because they were not given complete and truthful information about the drugs they were ingesting." *Id.* It is therefore clear that in the Second Circuit, that the § 2B1.1(b)(16) increase can be premised on the one fraudulent ground beef test submitted by N.E. Meat, which falsely reported a negative test for *E.coli* O1587:H7, irrespective of whether defendant Beqiri appreciated the risk or whether the risk was certain or even likely to occur.

The defendants acknowledge that the Second Circuit and other courts have upheld the enhancement as appropriate in cases involving insurance fraud, concurring that the risk of injury does not require actual injury, but focusing on the claim that the risk must be actual and not conjectural. *See United States v Jean, 647 Fed. Appx. 1,2 (2d Cir. 2016)(summary order)*(identifying where there were multiple staged collisions, the Court stated that as "one" of the victims was bleeding after an accident, application of the enhancement was justified). *Id.* They

provide citation to Seventh Circuit cases and a case from the Eastern District of Wisconsin to support their point. They ignore, however, the cases from this Circuit such as *Rigo* and *Wilosz* as well as the Ninth and Seventh Circuit cases cited above that support attribution of the specific offense increase for risk that is unclear. The risk at issue here is not conjectural; it is an identified and serious health risk.

The case that the defendant references, at length, *United States v. Benton*, from the E.D. of Wisconsin, is distinguishable in several respects. 323 F. Supp. 2d 903 (E.D Wisc. June 17, 2004) In *Benton*, the defendant, an aircraft dealer, was charged with making a false statement to the Federal Aviation Administration where he claimed that two planes that he sold had been inspected when, in fact, the signatures of the purported inspectors had been forged on both certificates, in addition to a subsequent sale of a third plane. *Id.* at 904. When one of the buyer's learned of the lack of inspection, the falsified inspection results were reported to the FAA. Following a guilty plea, the PSR recommended an increase for a conscious or reckless risk of death or serious bodily injury for the involved forged documents. *Id.* at 904-05. The Court found the fact that the plane was not inspected on time did not automatically render the plane dangerous and did not apply the increase.

The scenario in *Benton* is vastly different from the circumstances in this case. N.E. Meat's HACCP plan was of its own design and not a required yearly Government inspection, as were the planes in *Benton*. Additionally, the FAA was concerned with the safety of a single airplane where one inspection was untimely. By contrast, the FSIS is concerned with the safety of thousands of pounds of meat when reviewing N.E. Meat's HACCP plan testing results. The proposed quarterly rate of testing by N.E. Meat is in place to ensure that the firm's raw ground HACCP system is functioning and to provide a check on the safety of the product to ensure the safety of the entire community. And because the firm is testing numerous lots of ground beef each quarter, a result

from one lot is not indicative of the safety of a different lot. It is therefore imperative that all tests are performed and that N.E. Meat has true and adequate documentation of its sampling results to support their HACCP system.

      b.  The FSIS Food Safety Assessment

The defendant asserts that the Government cannot demonstrate the offense which resulted in the failure to test one of the quarterly beef samples in March of 2017 presented a risk of bodily injury or death. Def. Memo at 13. In support of his claim, he relies on various provisions of the FSIS Food Safety Assessment ("FSA"), which outlines non-compliances by N.E. Meat, but does not identify the falsified ground beef sample report as a risk to the public and does not recommend that N.E. Meat be shut down, asserting that as a result, the Government cannot claim that the falsified report creates a risk of serious bodily injury or death. *Id.* at 13-18. He fails, however, to appreciate that the FSA report does identify a significant health risk. He also fails to recognize that the purpose of the report was not to pursue administrative sanctions against N.E. Meat for this significant non-compliance that did create a risk of bodily injury or death. The agency will seek to pursue sanctions determined to be appropriate at the conclusion of this criminal proceeding. At that time, evaluation of the risk created will be addressed.

The FSA is a tool utilized by the FSIS District Office to assess and analyze the establishment's food safety system as a whole and is not utilized for the sole purpose of whether enforcement action will be taken. *See* FSIS Directive 5100.1.[8] In this case, the FSA recommendation was to issue Noncompliance Records. FSA at 1. One of the noncompliance record issues was for "the establishment's failure to maintain…lot support for *E.coli* O157:H7 sampling conducted in the raw ground HACCP process. FSA at 2. It is noted that the FSA does

---

[8]https://www.fsis.usda.gov/wps/wcm/connect/31bb80000-fb33-4b51-964b-1db9dfb488dd/5100.1pdf?MOD=AJPERE

not mention the fact that N.E. Meat falsified the lab reports. While it does mention a lack of complete testing as the most significant noncompliance on page 3 of the report, it does not address the falsified reports. It therefore follows that any analysis in the FSA regarding the risk to the public of the falsified ground beef test was an analysis of the food safety hazard relating to the lack of laboratory reports and not relating to the food safety hazard involving the falsification of the laboratory reports.

Notwithstanding the fact that the FSA report was not drafted for the purpose of evaluating N.E. Meat's noncompliance as a result of the falsification of the lab reports, the FSA report, did, in fact, identify the health risks created by the defendant's actions. On page 27 of the FSA report, the author concludes that "[f]ailing to conduct sampling by supportable frequencies and methods calls into question the effectiveness of the food safety system in reducing or eliminating STEC pathogens." Additionally, on page 28 of the report it states: "[f]ailing to take a representative sample from the finished lot means that this quarterly sample could not possibly support the ongoing verification of the effectiveness of the establishment's STEC controls." And lastly, in response to question number 7 on page 14 of the FSA, where the form asks, "… does the establishment have measures in place to support that STEC has been reduced to below detectable levels and is a hazard "not reasonably likely to occur?" A response of "No" is provided.

c. The Negative FSIS Test Result Obtained Close in Time to N.E. Meat's Falsified Report Does Not Negate a Risk of Serious Bodily Injury or Death

Defendant Beqiri lastly argues that because FSIS sent a ground beef sample for laboratory analysis at approximately the same time as their falsified lab report, and the FSIS test was negative for *E.coli* O157:H7 bacteria, that there was no possibility of a risk of serious bodily injury or death to the public. This is simply wrong. N.E. Meat identified quarterly testing of ground beef for *E.coli* O157:H7 as a control measure to support decisions made in their hazard analysis for raw

ground beef products. Pursuant to 9 CFR 417.2(a)(1), an establishment is required to conduct a hazard analysis and identify preventative measures to control identified hazards. The establishment is further required to maintain all supporting documentation for decisions made in their hazard analysis. 9 CFR 417.5(a)(1). In this case, N.E. Meat proposed quarterly testing as a control measure to address hazards that were identified and was, therefore, required to perform the testing and maintain those records.

The falsified ground beef *E.coli* O157:H7 test result was dated March 27, 2017; N.E. Meat did not perform any tests, whatsoever, for ground beef during the first quarter of 2017. They argue that because ground beef testing conducted by FSIS was negative, that there was no actual food safety hazard. However, STEC contamination is generally point-source contamination that occurs specifically as a consequence of handling during the hide removal and dressing of the carcass. https://www.fsis.usda.gov/wps/wcm/connect/c100dd64-e2e7-408a-8b27-ebb378959071/10010.1Rev3pdf?MOD=AJPERES. The fact of one negative or positive test result does not guarantee that another sample from the same time period would have the same result. Further, FSIS notifies establishment management in advance of when government samples are to be collected in order to allow the establishment time to ensure that the lot being sampled is withheld from entering commerce. More specifically, FSIS Directive 10.010.1 instructs FSIS inspectors to provide the establishment with notice at least one day in advance of sampling. The testing that the firm is doing provides ongoing verification of their raw ground beef HACCP system. Without valid test results, there is no verification by N.E. Meat that their raw ground beef HACCP system is functioning as designed.[9]

To summarize, the defendant's three arguments attempting to show that there is no basis

---

[9] It is additionally noted that on March 9, 2020, N.E. Meat had a positive result for *E.coli* O157:H7 in a risk based sampling of raw ground beef collected by FSIS. This is significant to show that positives have, in fact, occurred at this establishment.

for the specific offense increase in this case are without legal and factual merit. There is clear case law and scientific support for application of the U.S.S.G. 2B1.1(b)(16)(A) increase in this case by the preponderance of the evidence standard.

3. <u>Sentencing Factors</u>

The Government submits that a Guideline sentence is necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for defendant's offense, and to provide general deterrence.

a. The Nature and Circumstance of the Offense

As this case demonstrates, the defendant, as owner of a meat processing and packing plant, was in a position to falsify test results that were mandated by the safety plan designed by his own business that would have a potentially devastating impact on the health and safety of the ultimate consumers of his meat products. And whether he ordered and orchestrated the preparation of the falsified testing results that were placed in N.E. Meat's lab sample binder for review by the USDA FSIS or knew that it was happening, his claimed lack of thought regarding the potential consequences is simply unfathomable. His statement that "the reason for our firm not collecting and submitting all these required samples was simply because we considered it an inconvenience and a nuisance" is simply astounding and demonstrates his indifference to the safety and welfare of others. PSR ¶ 13.

b. History and Characteristics of the Defendant

The PSR outlines the circumstances regarding the defendant's upbringing. PSR ¶¶ 40-45. While it appears that his material needs were met, he described his family as a "strict working family" with immigrant parents whose marriage was arranged and never got along. PSR ¶¶ 39, 43. The defendant recalls spousal abuse that led to his mother leaving the family when he was 15

years old. PSR ¶ 43. He states that he is not close to his mother, who cares for his disabled brother. PSR ¶ 47. Both father and son speak well of one another and state that they have worked together to make the business successful. PSR ¶ 46, 49.

The defendant states that he lives in his own home in Tolland, Connecticut with his spouse, who he married in 2011, following their meeting in Albania, and their three children. PSR ¶ 50. He advises that she came to this country when she naturalized as a United States citizen, that they get along very well, and he feels fortunate to have her in his life. *Id.*[10]

The defendant has no criminal history, but as he notes in his Sentencing Memorandum, he had two prior arrests occurring when he was in his twenties. Def's Memo at 21, PSR ¶¶ 36-37. He is currently 33 years of age. PSR ¶ 39. These charges, which were dismissed and withdrawn, respectively, are nonetheless telling with regard to the defendant's character. The first involved a false report to law enforcement with regard to a car accident occurring in November 2010, in the early morning hours in Patterson, New Jersey, where the defendant was working at the meat packing company in Connecticut and staying at local hotels. PSR ¶ 36, 45. An investigation regarding the accident revealed that the defendant reported his car stolen less than one hour after the accident. PSR ¶ 36. The defendant later admitted that he falsely reported the car as stolen and that he was the driver of the vehicle in the accident. *Id.* He was originally charged with false

---

[10] It is noted that the defendant's wife, Mejreme Beqiri, made a series of recorded telephone calls on October 5, 2018 (two calls), October 12, 2019 and February 5, 2019, to Connecticut Health Insurance Exchange, dba: Access Health CT, for the purpose of obtaining Husky insurance benefits through Medicaid that are intended for low income individuals and families, for herself and her two children. During the February 5, 2019 call, under the pains and penalties of perjury, the defendant's wife stated that she was divorced, six months pregnant, a lawful permanent resident of this country, and living at a new address with her sister-in-law, with her children and without her husband. Ms. Beqiri repeated these assertions in an online application recorded on January 18, 2020. These calls, in addition to Access Health CT's written reports of the telephonic applications, are available for the Court's review, and will be provided to defense counsel and the U.S.P.O. at the time of the filing of this Memorandum.

report to a law enforcement agency, careless driving, failure to report an accident and leaving the scene of an accident. *Id.* The second arrest in Pennsylvania, where the charges were withdrawn, occurred less than two months following the first incident involved possessing an instrument of a crime, criminal mischief, criminal trespassing, theft by unlawful taking and receiving stolen property. PSR ¶ 37. It is noteworthy that both sets of charges involved dishonesty.

With regard to the instant offense, while it remains unclear whether defendant Smith undertook to prepare the false documents on her own and whether defendant Beqiri knew this occurred and did nothing to stop her or whether defendant Beqiri directed her to prepare the false documents, it is appreciated that defendant Beqiri had everything to lose by admitting that he directed the preparation of the false documents as it is his business.

   c.  Specific and General Deterrence

The defendant seeks a sentence of probation in this case, regardless of whether the specific offense characteristic resulting in a Sentencing Guideline range of 10 to 16 months, in Zone C of the Sentencing Table is imposed. Zone C requires that the minimum term of imprisonment be satisfied by: (1) a sentence of imprisonment; or (2) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention, according to the schedule in subsection (e), provided that at least one-half of the minimum term is satisfied by imprisonment. U.S.S.G. § 5C1.1(d). As such, at best, if the enhancement at issue is imposed, the defendant is required to serve at least one half of the minimum term, or 5 months in custody. The defendant seeks to avoid custodial time.

The need for a sentence that conveys a firm message of general deterrence as well as specific deterrence is both necessary and appropriate in this case. The defendant's participation in in creating fraudulent documents purporting that the meat that goes into our communities is safe for human consumption creates both health and social consequences to both potential victims who

purchase the meat, as well as the community at large. A message needs to be sent that this criminal conduct involving lies and deceit which has the potential to adversely impact the general public will not be tolerated. Thankfully, as far as the Government can determine, no one was taken ill or suffered significant health consequences.[11]  But, the fact that no one was taken ill or worse, does not diminish the need to send the message of deterrence by denying a downward variance in this case.

        d.   Imposition of a Fine Is Appropriate in this Case

The Sentencing Guidelines calculate a fine of between $5,500 and $55,000 in this case. Based on the defendant's financial affidavit, there is no reason why a fine should not be imposed. The PSR concurs with this assessment. PSR ¶ 61.

---

[11] The Government's inquiries to the State Departments of Health in the states where N.E. Meat's products were distributed during this time frame, as well as the fact that there were no reports of illness made by the distributors of the meat products sold by N.E. Meat, suggests that no one was sickened as a result of N.E. Meat's falsification of the required laboratory reports testing for *E.coli* O157:H7.

## V.    <u>Conclusion</u>

For the reasons outlined above, the Government respectfully requests that the Court impose a fair and just sentence within the correctly calculated Sentencing Guideline range, that includes the U.S.S.G. § 2B1.1(b)(16)(A) specific offense characteristic increase for the risk of serious bodily injury or death, that reflects the seriousness of the involved criminal conduct. The Government also respectfully requests that the sentence imposed be followed by a period of supervised release to ensure that the defendant continues to abide. Lastly, it is additionally recommended that a fine be imposed within the Sentencing Guideline's recommended range.

Respectfully Submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY

*/s/ Deborah R. Slater*
DEBORAH R. SLATER
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. ct04786
450 Main Street, Room 328
Hartford, CT 06103
(860) 947-1101

<u>CERTIFICATION OF SERVICE</u>

Pursuant to the Court's designation of this matter as an electronically-filed case, and in accordance with the requirements for certification of service in such cases, the undersigned certifies that the foregoing document was filed electronically on this 28th day of April, 2020. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Deborah R. Slater*
_____
DEBORAH R. SLATER
ASSISTANT UNITED STATES ATTORNEY