UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO 3:19CR208 (AWT) |
| | : | |
| v. | : | |
| | : | |
| MEMET BEQIRI | : | May 19, 2020 |

DEFENDANT'S REPLY TO GOVERNMENT'S MEMORANDUM IN AID OF

SENTENCING

The defendant, Memet Beqiri, in accordance with Rule 32(o) of the Local Rules of Criminal Procedure, respectfully submits this reply memorandum in aid of sentencing in connection with the above-captioned matter.

I.   **The U.S.S.G. § 2B1.1(b)(16) Enhancement is Inapplicable.**

The Government incorrectly argues that the defendant takes a position contrary to its assertion that one single piece of ground beef contaminated with E. coli O157:H7 could present a significant risk of death or serious bodily injury; the defendant has never argued otherwise and even pointed out in her memorandum in chief the harmful effects if one were to consume contaminated meat. Gov't Brief at 15 (ECF Doc. 36); Def't. Brief at 4, n.1. (ECF Doc. 33).

Instead, the defendant argues that failure to test one sample did not present the risk required for application of the enhancement, and her conduct did not exhibit conscious or reckless risk of death or serious bodily injury. In support of these arguments, the defendant cited (1) FSIS's lack of immediate action to stop New England Meat Packing from further "endangering" the public; lack of immediate action demonstrated that the alleged risk was not significant enough for FSIS to appreciate two and one-half years ago when the defendant's criminal conduct was discovered, (2) failure of the FSA to identify how the company's failure to test one ground beef sample (and falsify a report indicating that a sample had been tested and

1

was negative for E. coli O157:H7) impacted the company's ability to produce safe food products, (3) other effective control measures were in place designed to prevent the contamination of ground beef (described as effective by the FSIS assessment); and (3) the results of multiple samples tested at USDA/FSIS labs from the first quarter of 2017, including a result from March 25, 2017, all indicating negative results for E. coli O157:H7.

### A. Cases cited by the Government do no harm to the defendant's arguments against the enhancement.

None of the cases cited by the Government undercut the defendant's arguments. United States v. Maestas, 642 F. 3d 1316 (10th Cir. 2011) is inapposite to this case. In Maestas, the gold was **actually** contaminated and the defendant knew it. Here, there is no evidence that meat from the untested quarterly sample/lot was contaminated. Additionally, despite the Government's implication otherwise, the record in Maestas very clearly supported that there was a significant amount of evidence relating to the risk:

> The district court's finding that the radioactive gold posed a danger of serious bodily injury or death was not clearly erroneous. The gold was contaminated with a significant amount of plutonium. The removable contamination on just the surface of the gold piece far exceeded the federal Annual Limit on Intake for plutonium exposure for both the general public and nuclear workers. ROA, Vol. 3 at 53; ROA, Vol. 1 at 80. The government presented evidence—in the form of an article in LANL's science journal and the opinions of persons knowledgeable in nuclear safety—that the plutonium contained in the stolen gold piece could be extremely harmful if it entered a person's body.

United States v. Maestas, 642 F.3d 1315, 1322 (10th Cir. 2011). Additionally, Mr. Maestas admitted in his pleadings that he was aware of the risk presented by the contaminated gold. Id. at 1321-22. Finally, and most importantly, while the defendant takes no quarrel with the Government's assertion that Maestas held that the Government need not prove that the defendant was subjectively aware of the risk of serious bodily injury, the Government's brief does not

2

include the full holding interpreting the guideline to "require the defendant to have been **conscious of or reckless as to** the existence of the risk created by his or her conduct:

> Generally, recklessness is an objective standard, and we interpret 'reckless risk' to describe objectively culpable conduct. We hold that a defendant's conduct involves a conscious risk if the defendant was subjectively aware that his or her conduct created a risk of serious bodily injury, and a defendant's conduct involves a reckless risk if the risk of bodily injury would have been obvious to a reasonable person.

Id. at 1321. Thus, the enhancement requires much more than strict liability. At the very least, it requires the assumption of a "reckless risk" that would have been obvious to a reasonable person. The Government's brief leaves this part of the holding out.

The Government also misses its mark in citing United States v. Wolosz, 485 Fed. Appx. 509 (2d Cir. 2012). In Wolosz, the defendant intentionally hired someone to inflict violence on another person. Analogizing Wolosz to the case at bar is only successful if one speculates and assumes facts about the case at bar that are unsupported by evidence, and disregards facts that are supported by evidence. For the facts of Mr. Beqiri's case to come even close to Wolosz, we have to assume that the untested March, 2017 sample was contaminated. There is, however, no evidence of this. In fact, there is evidence to the contrary, and that is the evidence we would have to ignore to successfully analogize the two cases. Critical evidence – that multiple samples from the first quarter, including one taken at the end of March, were tested at USDA/FSIS labs with negative results for E. coli O157:H7 – removes this case from any proximity to Wolosz.

As with Maestas, the Government did not include the full scope of the Wolosz court's interpretation of the enhancement:

> In order for the § 2B1.1(13)(A) enhancement to apply, the risk of bodily injury—not the specific type of injury— must have been known to the defendant or, if unknown to the defendant, the risk of bodily injury must have been the 'type of risk that is obvious to a reasonable person and for which disregard of said risk represents a gross deviation from what a reasonable person would do.' United States v. Lucien, 347 F.3d 45, 56-57 (2d Cir. 2003).

3

Wolosz, 485 Fed. Appx. at 514.  Again, the enhancement is not satisfied by strict liability.

Additionally, United States v. Rigo, 2015 U.S. Dist. LEXIS 62239, *3 (S.D.N.Y. 2015) does no harm to the defendant's arguments because Rigo, like Wolosz and Maestas, involved risk that was certainly more than conjectural – second hand, mislabeled medications, in and of themselves present a risk to the consumer.  An untested ground beef sample/lot that is processed in a facility that has multiple negative sampling results (for harmful E. coli) for the same quarter, and one within days of when the untested sample was supposed to be tested, does not present the risk claimed by the Government.  Any risk associated with that ground beef sample, based on the facts of this case, is purely conjectural.

The Government's attempt to distinguish United States v. Benton, 323 F. Supp. 2d 903 (E.D.Wisc. June 17, 2004), from the case at bar is ineffective.  The mere fact that the sampling at issue here was "of [New England Meat Packing's] own design" and that the inspection mandated in Benton was Governmental, does not support the Government's claim that the cases are "vastly different."  The Government's attempt to illustrate a difference underscores that the defendant in Benton, where the court **declined** to apply enhancement, was more deserving of the enhancement than Mr. Beqiri because (1) the inspection was Government mandated, and (2) there appeared to be no other safeguards in place besides the yearly inspection.  Here, Government inspection/testing of the ground beef (with negative results) took place within days of the date that the sample should have been tested at the private lab. The USDA/FSIS testing from that same time period demonstrated that New England Meat Packing had contamination preclusive measures in place during the processing of ground beef that were effective. Additionally, the Government's claim that Benton and the instant case are "vastly different" because Benton involved the inspection of a single plane, and the instant case involves

4

"thousands of pounds of meat," is unavailing. First, it is unclear whether the lot of meat related to the "untested" sample from March, 2017, was the same lot subject to USDA testing. It is also unclear how large the untested lot was. Second, if, as the Government now seems to claim, negative results from the USDA tested samples are irrelevant because the "unsent" sample may have (or should have) been drawn from a different lot of meat, why are meat processing plants not required to test **every single lot** of ground beef processed?

### B. The FSIS does not identified health risks created by the defendants' criminal conduct.

The Government claims that the FSA "did, in fact, identify the health risks created by the defendant's actions." Gov't Brief at 19-20. Citing page 27 of the report, the Government points out that the investigator asserted "failing to conduct sampling by **supportable frequencies** and **methods** calls into question the effectiveness of the food safety system in reducing or eliminating STEC pathogens." (Emphasis added). However, the Government does not include the specific findings that preceded this conclusion:

> The establishment is supposed to conduct quarterly ground beef sampling for E. coli 0157:H7, as well as quarterly beef carcass swabbing for E. coli 0157:H7. The establishment references a University of Wisconsin article for support of ground beef sampling frequency (quarterly). The U of W article **does not support this frequency**. The quarterly ground beef sampling is identified in the raw ground hazard analysis as a control measure for pathogen outgrowth, as well as being used for ongoing verification of the raw ground HACCP system. **The establishment has not conducted quarterly sampling of ground beef as required by the written HACCP system**. These findings are noncompliant with 9 CFR 417.4(a)(2) and 417.5(a)(1).

> The quarterly carcass testing is used as ongoing verification for the beef slaughter HACCP system. The 'E.coli 0157:H7 procedure & frequency' program states that a surface area of 100cm2 is swabbed from 3 locations (flank, brisket, and rump) for a total of 300cm2 per beef carcass sampled. The actual sample results are reported in terms of 'E. Coli O157:H7 /8000 cm2.' The results (E.coli/8000cm2) do not correlate with the sampling method described in the written sampling method described in the establishment's HACCP system (300cm2 surface area swabbed). This is noncompliant with 9 CFR417.5(a)(1).

FSA at 27 (ECF Doc. 33-2, attached to defendant's memorandum in aid of sentencing). The FSA criticism at page 27 – cited by the Government, thus relates to two specific areas: First, New England Meat Packing self-determined that quarterly testing of ground beef samples was sufficient. It was required to include scientific support for this measure in its HACCP plan. The FSA criticism cited here points out that the article relied on in the plan does not actually support the quarterly testing frequency. This has nothing to do with the offense at bar. Additionally, the method of carcass swabbing, another criticism cited here, is unrelated to the offense at bar. The passage cited by the Government at page 27 references failure to conduct sampling by supportable frequencies and methods. It is a criticism of the lack of scientific support and alleged improper swabbing method. The extent to which this criticism rests on failure to conduct first quarter sample testing (though generally mentioned in the above passage from page 27) is unclear. What is clear is that in multiple areas of the FSA where the investigator was given the opportunity to address failure to test for the first quarter and its impact of food safety, the investigator offered no such description. See Def't Brief at 14-16.

Similarly, the passage cited by the Government from page 28 of the FSA, in context, demonstrates that the Government's reference is not related to failure to conduct testing during the first quarter:

> The Raw Ground HACCP plan uses quarterly sampling of ground beef as part of ongoing verification. The raw ground sampling program references the establishment's 2003 University of Wisconsin acetic acid support paper to support the quarterly sampling frequency. This 2003 University of Wisconsin support document **does not reference or support a quarterly sampling frequency**. This is noncompliant with 9 CFR 417.5(a)(2). The actual sample portion (375 grams analyzed out of 2 pounds submitted, taken from final ground) is acceptable as written. However, a noncompliance was issued in September of this year **because the establishment collected a 5 pound portion of meat from a beef leg and used this to grind 2 pounds of ground beef for a sample submission** (quarterly 0157:H7 sample). This was found noncompliant with 9 CFR 417.4(a) and 417 .5(a)(1). **Failing to take a representative sample** from the finished lot

means that **this quarterly sample could not possibly** support the ongoing verification of the effectiveness of the establishment's STEC controls.

FSA at 28. In full context, it is clear that the excerpt cited by the Government does not refer to failure to test a sample during the first quarter – which resulted from the offense conduct, but it refers to improper **methodology** in **collecting** a sample from the third quarter, which was in no way related to the offense conduct. Finally, and again, the Government refers to an excerpt from page 14 of the FSA and the partial answer to question 7, necessitating clarification. The Government cites this passage as supporting its claim that the FSIS report "did, in fact, identify the health risks created by the defendant's actions"; however, the passage cited by the Government, in full, has nothing to do with the defendant's criminal conduct (text in bold is the text cited in the Government's brief):

> 7. Q: Considering all source materials used (i.e., self-supply through slaughter and outside source materials) and products produced (i.e., non-intact beef and non-intact beef components), **does the establishment have measures in place to support that STEC has been reduced to below detectable levels and is a hazard "not reasonably likely to occur?"**
>
> \* If no, briefly describe any vulnerability or noncompliance, and assess the impact your findings have on the food safety system. If yes, leave the free text box blank.
>
> A:. **No**
>
> The establishment uses scientific support (Small Plant Intervention Treatments to Reduce Bacteria on Beef Carcasses at Slaughter, University of Wisconsin) as support for the critical limit at CCP 38 (Acetic Acid Wash) of 2 -2.5 % acid solution. The article does not include any scientific data describing the log reduction of E.coli 0157:H7 achieved by acetic acid. This is noncompliant with 9 CFR 417.5(a)(2).
>
> The Raw Ground hazard analysis uses quarterly sampling of ground beef as a control measure to control pathogen outgrowth. The raw ground sampling program references the establishment's University of Wisconsin acetic acid support paper to support the quarterly sampling frequency. This University of Wisconsin support document does not reference or support a quarterly sampling frequency. This is noncompliant with 9 CFR 417.5(a) (1).

FSA at 14 (Emphasis added). Full review of the question and answer demonstrates that the excerpts cited by the Government do not relate to failure to submit the first quarter ground beef sample for testing, but relate to the efficacy of acetic acid wash and whether a scholarly article supports quarterly sampling frequency.

    **C. The USDA/FSIS lab results from the first quarter are relevant and support the inapplicability of the enhancement.**

The Government further argues that the Court should dismiss the import of the USDA/FSIS lab results from the first quarter as they relate to the whether a risk existed and whether the defendant consciously or recklessly disregarded it. Certainly these results demonstrating that multiple first quarter samples tested negative for E. coli O157:H7, reflect the efficacy of New England Meat Packing's HACCP system. Moreover, if, as the Government argues, the results of the USDA/FSIS testing is insignificant because negative results from the Government labs do not guarantee that other samples from that same time period would have the same results, one would expect the USDA/FSIS to require plants to test every single lot of ground beef processed, regardless of the volume processed. There is no such requirement.

According to 2017 FSIS Compliance Guideline for Minimizing the Risk of Shiga Toxin-Producing Escherichia coli (STEC) in Raw Beef (including Veal) Processing Operations, in addressing how often ongoing verification needs to be conducted, the FSIS directs[1]:

---

[1]     It is important to note that FSIS recommends product testing. It is not mandated:
A common question posed to FSIS personnel by establishment owners is, "where in the regulations does it say I have to test for STEC?" To be clear, there is not a specific requirement for product testing. However, understanding why product testing is so common and why it is so important for a sound HACCP system relates to the complexity of the hazard itself.

Per 9 CFR 417.4, establishments perform verification procedures such as, calibrating process monitoring instruments, directly observing monitoring and corrective actions, and reviewing the records. This list is not all encompassing, and does not include all

8

Ongoing verification should be designed to ensure that the HACCP system is functioning as intended. Knowledge of individual controls applied to address STEC, the number and types of products produced, the intended and final actual use of the product, the production volume, past HACCP system failures, and other factors should be considered when developing ongoing verification procedures and frequencies.[2]

Additionally, the FSIS stresses, "Focus and thought should be placed on the design of the ongoing verification procedures, frequencies, and the data generated to show how the HACCP system is functioning as intended, **instead of where any given data point comes from** (establishment **or FSIS result**)."[3] Clearly, FSIS contemplates establishments, like New England Meat Packing, placing some reliance on the FSIS lab results. In fact, FSIS states as much in the Compliance Guideline,

> . . . For that reason, FSIS **does not prohibit** establishments from using **FSIS test results** when documenting the establishment's sampling plan implementation, as the results **can provide meaningful process control verification data**. The frequency with which FSIS conducts sampling is not designed to support each individual HACCP system, and establishments should not rely solely on FSIS results. However, if an establishment elects to use an FSIS sample result **in lieu of** collecting its own in-house sampling, the

---

ongoing verification activities necessary for every HACCP system. For non-intact beef products and beef products intended for non-intact use, the HACCP system needs to reduce STEC below detectable levels. Because microbial contamination is not visible, establishments often perform microbiological testing to verify the HACCP system is functioning as intended to reduce STEC to below detectable levels. Each establishment must develop its own approach to controlling STEC and develop a method of ongoing verification. Sampling and testing can play a critical part in that systematic approach. Testing of product provides a statistical confidence that the product is not contaminated with STEC. However, negative test results do not provide 100% certainty that the product is not contaminated. For that reason, testing is a verification activity that demonstrates that a HACCP system is functioning as intended rather than a control for pathogens.

FSIS Compliance Guideline for Minimizing the Risk of Shiga Toxin-Producing Escherichia coli (STEC) in Raw Beef (including Veal) Processing Operations, 2017 at
https://www.fsis.usda.gov/wps/wcm/connect/c1217185-1841-4a29-9e7f-8da6dc26d92c/Compliance-Guideline-STEC-Beef-Processing.pdf?MOD=AJPERES.

[2] Id., 9-12.

[3] Id. (Emphasis added).

establishment's written ongoing verification program must provide detailed decision-making outlining how the FSIS result meets the established design of its written program, rather than simply relying upon FSIS testing.[4]

While the defendant does not assert that New England Meat Packing elected to rely on FSIS testing; the FSIS compliance guidelines allowing such reliance, further underscores that the FSIS first quarter results support the defendants' argument that the enhancement does not apply.

**D. If, in the fall of 2017 FSIS appreciated the risk of which the Government now complains, it should have (and could have) taken immediate action.**

Finally, the Government appears to argue that the USDA/FSIS's failure to take injunctive or other protective measures in the fall of 2017, closer in time to the defendant's criminal conduct, is not worth considering in determining whether the enhancement is applicable. The Government further asserts that after the criminal matter is resolved, the USDA/FSIS will take further administrative action against New England Meat Packing – as though this belated response (two and one-half years later), sufficiently addresses the alleged risk that the defendants presented to consumers.

One would hope that if FSIS appreciated that the defendants' conduct created a risk of death or serious bodily injury, and that the defendants acted with derelict judgment in the fall of 2017, that FSIS would have taken measures to protect consumers from further alleged acts of recklessness – immediately – not two and one-half years later. FSIS did not do so, and it did not do so because there was no such risk, and the defendants did not act with the mental state now claimed by the Government. By supporting the Government's current assertion that the enhancement applies, FSIS tacitly admits its negligence in failing to take immediate, consumer-

---

[4] Id. (Emphasis added).

protecting action. Finally, there are a plethora of administrative actions that FSIS can take in situations where consumers are placed at risk:

> The FSIS Rules of Practice, which are set out in 9 CFR Part 500, define the type of administrative enforcement actions taken by FSIS, the conditions under which these actions are appropriate, and the procedures FSIS follows in taking these actions. FSIS takes these administrative actions **to ensure sanitary conditions and the production of wholesome products, to prevent the preparation of adulterated products, and to ensure public health and safety**.
>
> FSIS administrative enforcement actions as defined in the Rules of Practice (9 CFR 500.1) include regulatory control actions, withholding actions, and suspensions. A regulatory control action is the retention of product, rejection of equipment, or refusal to allow the processing of a specified product. A withholding action is the refusal to allow the marks of inspection on products. A suspension action is the interruption of the assignment of FSIS employees in all, or part, of an establishment.
>
> **A suspension action may be taken by FSIS when products have been produced under insanitary conditions or when the establishment has shipped adulterated products**. Other actions for which FSIS may take a suspension action include inhumane handling or slaughtering of livestock, intimidation of FSIS inspection officials, **violations of a regulatory control action,** or other reasons as described in the Rules of Practice. When there is an **imminent threat to public health or safety** such as the shipment of adulterated product, **FSIS takes immediate enforcement action**. In other situations, FSIS provides the establishment prior notification of intended enforcement action and the opportunity to demonstrate or achieve compliance. This is called a Notice of Intended Enforcement (NOIE).
>
> FSIS also may place a suspension action in abeyance if an establishment presents and puts into effect corrective and preventive actions. In appropriate situations, FSIS also may defer an enforcement decision based on corrections submitted by the establishment. FSIS monitors and verifies an establishment's implementation of corrective and preventive actions, and takes follow-up action if needed to protect the public health.[5]

FSIS did not utilize the tools readily available to it. Clearly FSIS did not perceive the risk that the Government now claims existed.

---

[5] https://www.fsis.usda.gov/wps/portal/fsis/topics/regulatory-compliance/regulatory-enforcement/quarterly-enforcement-reports/qer-q4-fy2018. (Emphasis added).

## II.     Offense Conduct of the Defendant.

As the Government correctly points out in its description of the responsibilities of each of the defendants, defendant Beqiri was, and continues to be, the President and General Manager (a/k/a Managing Member) of New England Meat Packing and the defendant, Debbie Smith, was the duly designated Hazard Analysis and Critical Control Point ("HACCP") Coordinator during the time period charged in the Information (see Government's Memo in Aid of Sentencing at p. 3).

The Government sets forth in detail "Defendant Smith's Duties and Accounts of Pertinent Events" while she was employed by N.E. Meat Packing (see Government's Memo in Aid of Sentencing at p. 8.) For the first two years of her employment she would take the swabs to Vallid Labs, however, in approximately August 2016, after performing her duly designated responsibilities and without prior notice to defendant Beqiri, she grew tired of doing it on her own time and instead simply placed the swabs in the cooler at the plant. She subsequently, in September 2016, observed that no one was taking the samples to the laboratory for testing. In an interview of defendant Smith by FSIS OIEA Investigator Froelich on August 8, 2018 she described her role in the offense for which she pled guilty, followed by a statement to Investigator Froelich on the same date.

The Government in its Memorandum in Aid of Sentencing, at p. 9 para. 3 sets forth "Defendant Beqiri's Account of Pertinent Events." As the owner of N.E. Meats Mr. Beqiri was interviewed on two separate occasions by Investigator Froelich on September 26, 2017 and November 7, 2017. It ought to be noted that these interviews took place more than one year prior to Ms. Smith's interview.

Unfortunately, the Government has taken the position that "[t]he offense conduct details provided by defendant Beqiri and defendant Smith remain <u>completely</u> inconsistent." <u>Government Sentencing Memo</u> at p. 11 (Emphasis added).

Mr. Beqiri in both of his statements to Investigator Froelich on September 26 and on November 7, 2017 and at his Change of Plea colloquy on August 20, 2019, as well as in his Memorandum in Aid of Sentencing, referenced his actions as true and accurate statements and recollected the events as he recalled them, more than one year prior to Ms. Smith's statements to Investigator Froelich. What does appear to be clear and obvious, is that both defendants' recollections of the events leading up to the offenses for which they pled to, are honest and true to the best of their recollection and both have readily admitted their respective roles in the offense which, contrary to the Governments contention, is substantially "consistent", in that both admitted that their respective conduct originated from "inconvenience". Both have admitted to their respective roles for said conduct and both have accepted full responsibility for their actions.

**III. Sentencing Parameters.**

The defendant concurs with the Governments overview of the Sentencing Parameters (see <u>Governments Memorandum</u> pp. 11-12.)

**IV. Argument.**

The defendant, however, takes issue with the Government's "Argument" that defendant Beqiri, as owner of N.E. Meats, "bares <u>full responsibility</u> for the fraudulent laboratory reports that were placed in his [N.E. Meats] business binder for review by the FSIS" <u>Id</u>. at p. 3. Without repeating the defendant's arguments set forth in Section I above, refuting the applicability of the Governments sought Enhancement, it is irrefutable that while defendant Beqiri was the owner of N.E. Meats he hired defendant Smith as the corporate HACCP coordinator and made sure that

she received thorough and appropriate training by a retired USDA FSIS Inspector, who prior to his retirement was assigned to the N.E. Meat's plant overseeing its HAACP plan. Defendant Smith has readily admitted that she failed to carry out her specifically designated responsibility of transporting the carcass swabs to Vallid Labs, LLC for testing. She did so without prior notice to defendant Beqiri, her supervisor, but unfortunately when Mr. Beqiri became aware of it he readily admitted failing to remedy the situation with her complicity, as was required.

**V.     Sentencing Factors.**

The Government submits and requests that a guideline sentence is necessary to reflect the seriousness of the offense. If, as respectfully hoped and argued for by the defendants, the Court finds that the Government has failed to meet its burden of a preponderance of evidence standard required to support the Government's enhancement application under U.S.S.G. § 2B1.1(b)(16)(A), the defendant requests a guideline sentence and one of probation only.

If, however, the Court finds for the Government, the defendant will seek a statutory non-custodial nonguideline sentence based upon the following compelling reasons, (as well as those already set forth in the defendant's <u>Memorandum in Aid of Sentencing</u> dated April 6, 2020):

1. Mr. Beqiri has no prior criminal history and notwithstanding the Government's reference to two prior arrests as set forth in the PSR ¶39 the first charge of "false reporting to law enforcement" in November 2010 was "dismissed" the second, in Pennsylvania, was "withdrawn." Hence, negative inferences should not be drawn as to either one. His constitutional presumption of innocence remains unfettered and the final dispositions of these matters ought to be viewed and treated as such.

2. The Government acknowledges that N.E. Meats is a small to medium sized facility serving clients requiring custom Halal and other specialty meats and are "… <u>one of a</u>

small number of specialty meat packaging companies in the northeastern United States catering to this client, their volume …, is significant". See Government's Memorandum in Aid of Sentencing pp. 4-5 (emphasis added.)

With this in mind and as has been demonstrated by the dozens of character reference letters written on behalf of the defendant by family, customers, acquaintances, and others (previously submitted to the Court as an "Addendum" to the defendant's Memorandum in Aid of Sentencing,) supporting Mr. Beqiri and N.E. Meats, indicating its benefits to the community it serves. (It ought to be noted that many of those who submitted letters to the Court plan to be present at the time of sentencing, COVID-19 restrictions permitting).

Mr. Beqiri's absence from the plant and its operations for any period of time will have a significant long term severe and detrimental effect upon the business as well as the community which it serves. In addition, an interruption in Mr. Beqiri's "hands on" involvement in the operation and management of the business will in all likelihood have a severe detrimental effect upon N.E. Meats continued viability.

The Government makes reference in its Sentencing Memorandum at p. 23 f.n. #10 to a series of recorded telephone calls made by Mr. Beqiri's spouse, Mejreme Beqiri, to the Connecticut Health Insurance Exchange D/B/A; Health CT. (These recordings were made available to the undersigned counsel who attempted to listen to all of them together with Mr. Beqiri. One of four was partially defective with intermittent silent portions.) Notwithstanding, counsel simply does not see the relevance of this information as it pertains to Mr. Beqiri, particularly in light of the fact that the information provided by the Government pertains only to Mrs. Beqiri's conversations. The only commentary that will

be provided is that Mrs. Beqiri is in fact a naturalized U.S. citizen and has been since November 29, 2018. Counsel has been provided with an original of Mrs. Beqiri's Certificate of Naturalization for which he has made a copy and will have it available at the time of sentencing should the Court wish to review it. Second, while Mr. and Mrs. Beqiri did have a brief, (approximately three month) separation in their marriage in the latter part of 2018, it has been represented to counsel that they reconciled in February 2019 and remain married and on good terms and continue to reside in the marital residence with their three young children.

3. Specific and General Deterrents.

The defendant, indeed, seeks a sentence of probation as appropriate in this case as is more specifically argued in the defendant's Memorandum in Chief, as well as above. Counsel, however, feels compelled to bring to the Court's attention the <u>Government's "Amended Memorandum in Aid of Sentencing"</u> pertaining to Ms. Debbie Smith dated May 5, 2020 (Crim. No. 3:19CR236 (AWT))." At p. 24 of said <u>Amended Memorandum</u> it specifically states that "The Government has agreed to take no position with regard to the defendant's request for a noncustodial sentence." This apparently was also indicated by the Government at the time of Ms. Smith's Change of Plea hearing which took place on September 23, 2019, more than one month after Mr. Beqiri's Change of Plea on August 20, 2019. (The Government's position was omitted from its original Memorandum dated April 27, 2020.)

When this came to the attention of the undersigned counsel he immediately felt compelled to contact Assistant U.S. Attorney Deborah Slater as to why the Government's position was omitted from Mr. Beqiri's Memorandum, particularly inasmuch as during counsel's

negotiations with the Government concerning Mr. Beqiri's Plea Agreement, the Government on numerous occasions indicated to the undersigned counsel, to the best of his recollection and belief, that it would not (necessarily) be seeking a custodial sentence for Mr. Beqiri. Hence counsel's surprise! Following discussions between the undersigned counsel and Attorney Slater counsel received an email from Attorney Slater dated Monday, May 11, 2020, in which she explains, in part, as follows:

> "My position will remain the same in that I am not advocating for custody for your client, but if the Guideline requires it, I will not agree to a downward departure or variance."

With this said, counsel chooses, at this time, not to further elaborate unless requested to do so by the Court giving Attorney Slater the opportunity to be heard.

## VI. Conclusion.

Wherefore, based on the argument in the defendant's Memorandum in Chief and in this memorandum, the defendant respectfully believes that a sentence of probation is appropriate.

Respectfully Submitted,

THE DEFENDANT
Memet Beqiri

/s/ Brian J. Woolf
Brian J. Woolf, Esq.
Woolf Law Firm, LLC
50 Founders Plaza
East Hartford, Connecticut 06108
Phone: 860.290.8690
Fax:    869.290.8697
Bar no.: ct10227
Email: w@woolflaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 19, 2020 a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Brian J. Woolf
Brian J. Woolf, Esq.