## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
------------------------------ x
                                :
UNITED STATES OF AMERICA        :
                                :
             v.                 :  Crim. No. 3:19-cr-208(AWT)
                                :
MEMET BEQIRI                    :
                                :
------------------------------ x

------------------------------ x
                                :
UNITED STATES OF AMERICA        :
                                :
             v.                 :  Crim. No. 3:19-cr-236(AWT)
                                :
DEBBIE SMITH                    :
                                :
------------------------------ x
```

## FINDING RE OBJECTION TO PRESENTENCE REPORTS

Defendant Memet Beqiri pled guilty to making and using a false document and aiding and abetting in violation of 18 U.S.C. § 1001(a)(3) and 18 U.S.C. § 2.  He objects to paragraph 22 of his Presentence Report, which includes an enhancement pursuant to U.S.S.G. § 2B1.1(b)(16)(A), based on a determination that "the offense involved . . . the conscious or reckless risk of death or serious bodily injury. . . ."

Defendant Debbie Smith pled guilty to making and using a false document in violation of 18 U.S.C. § 1001(a)(3).  She objects to paragraph 23 of her Presentence Report, which also includes an enhancement pursuant to U.S.S.G. § 2B1.1(b)(16)(A),

based on a determination that "the offense involved . . . the conscious or reckless risk of death or serious bodily injury. . . ."

"'Serious bodily injury' means injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation."  U.S.S.G. § 2B1.1 application note 1(M).

The government bears the burden of proving the enhancement by a preponderance of the evidence.  See United States v. Williams, 247 F.3d 353, 358 n.7 (2d Cir. 2002).  The court finds that the government has not demonstrated by a preponderance of the evidence that the enhancement applies in these cases.

The Stipulation of Offense Conduct for defendant Smith includes the following:

> Pursuant to the USDA's approved HACCP plan for N.E. Meat, the company is required to perform one generic E.Coli carcass swab per every 300 animals slaughtered and to periodically collect ground beef samples for E.Coli testing.  Defendant SMITH, as the HACCP coordinator, was aware of these requirements, as established by the executive branch of the United States government, more specifically, the USDA and administered by USDA's Food Safety Inspection Service ("FSIS").

> Between on or about November 3, 2016 and on or about September 9, 2017, defendant SMITH prepared and incorporated in the company's Lab Sample Report binder available for review by the USDA, FSIS, Office of Field Operations ("OFO"), a total of 36 separate documents relating to 51 separate carcass swabs and one ground beef sample on behalf of N.E. Meat.  The 36

documents were each on the letterhead of a certified
lab and signed by the laboratory director, each
stating that the required E.Coli testing of samples
submitted by N.E. Meat had been conducted and
completed and all 52 samples tested negative for
E.Coli.  Defendant SMITH knew that the 36 documents
relating to all 52 samples had not been submitted or
tested by the identified laboratory or any other
laboratory, as she prepared the fraudulent documents
using laboratory letterhead with the signature of the
lab director that was obtained from previous testing
that N.E. Meat had conducted with that laboratory.

Defendant SMITH knew that the laboratory testing
results were material to N.E. Meat's ability to
maintain compliance with their approved HACCP plan and
that if the results were not presented in the
company's Lab Sample Report binder for review by the
USA and/or FSIS OFO, that N.E. Meat would be
determined by the USDA, and/or FSIS OFO to be
noncompliant with resulting consequences.

(Plea Agmt. at 9, ECF No. 4 (No. 3:19-cr-236).)

The Stipulation of Offense Conduct for defendant Beqiri

includes the following:

Between on or about November 3, 2016 and on or about
September 9, 2017, defendant BEQIRI authorized the
preparation and submission in the company's Lab Sample
Report binder available for review by the USDA, FSIS,
Office of Field Operations (OFO), a total of 36
separate documents relating to 52 separate carcass
swabs and ground beef samples on behalf of N.E. Meat.
The 36 documents were each on the letterhead of a
certified lab and signed by the Laboratory director,
each stating that the required E.Coli testing of
samples submitted by N.E. Meat had been conducted and
completed and all 52 samples tested negative for
E.Coli.  Defendant BEQIRI knew that the 36 documents
relating to 52 samples had not been submitted or
tested by the identified laboratory or any other
laboratory, and that the documents had been
fraudulently prepared using laboratory letterhead
obtained from previous testing that N.E. Meat had
conducted with that laboratory.

Defendant BEQIRI knew that the laboratory testing
results were material to N.E. Meat's ability to
maintain compliance with their approved HACCP plan and
that if the results were not presented in the
company's Lab Sample Report binder for review by the
USDA FSIS OFO, that N.E. Meat would be determined by
the USDA, FSIS, OFO to be noncompliant.  Defendant
BEQIRI also knew that OFO's determination of
noncompliance could result in a shutdown of their
operations.

(Plea Agmt. at 9, ECF No. 5 (No. 3:19-cr-208).)

Goats were the predominate species slaughtered at New
England Meat Packing.  As part of its Hazard Analysis and
Critical Control Points ("HACCP") plan, New England Meat Packing
represented that it would send quarterly samples of raw ground
beef to a private lab to be analyzed for E. coli O157:H7, and
send weekly samples from goat carcasses to be analyzed for
generic E. coli.  The purpose of sampling the goat carcasses was
to give New England Meat Packing an overview of the sanitariness
of the plant and its equipment.

In September 2017, John Froehlich, Investigator from the
Food Safety Inspection Service within the office of the U.S.
Department of Agriculture, learned that defendant Smith and
defendant Beqiri had falsified the results for one ground beef
sample and 36 goat carcass samples by misrepresenting that those
same numbers of samples were sent to the lab for testing to
determine the presence of generic E. coli (goat), and E. coli
O157:H7 (ground beef).  In November, Froelich completed a Food

Safety Assessment, in which he analyzed New England Meat

Packing's HACCP program.  The Executive Summary includes the

following:

> Noncompliance records are being issued as a result of
> this food safety assessment (FSA).  Although there
> were numerous noncompliances noted during the FSA, the
> majority of these were design in nature.
> Noncompliances noted during the FSA included the
> establishment's failure to have complete written
> procedures and records for the removal, segregation,
> and disposal of SRMs (Specified Risk Materials) in the
> beef/veal slaughter and raw intact HACCP processes, as
> well as the establishment's failure to maintain
> scientific support for the sampling frequency and lot
> support for E. coli 0157:H7 sampling conducted in the
> raw ground HACCP process.  The establishment did not
> have valid scientific supporting documentation for the
> acetic acid antimicrobial intervention identified in
> the beef/veal slaughter and the raw intact and raw
> non-intact HACCP systems.
>
> The establishment failed to collect and analyze
> generic E. coli samples for goats, the predominant
> species slaughtered at this establishment.  Review of
> records revealed that only 16 samples were analyzed
> during the time period of November 1, 2016 through
> October 30, 2017.
>
> . . . .
>
> Despite these findings, observations during the FSA
> support that, overall, the establishment is
> maintaining sanitary conditions throughout the
> production processes for slaughter, raw intact, and
> raw non-intact HACCP systems.

(Def.'s Memo. in Aid of Sentencing, Ex. 2, at 2, ECF No. 33 (No.

3:19-cr-236).)

For the enhancement under § 2B1.1(b)(16)(A) to apply, "[a]

defendant's fraudulent conduct must have created a risk that

others would suffer serious bodily injury; moreover, said risk

must have either been known to the defendant (conscious), or, if unknown to the defendant, the type of risk that is obvious to a reasonable person and for which disregard of said risk represents a gross deviation from what a reasonable person would do (reckless)." United States v. Feldman, 647 F.3d 450, 463 (2d Cir. 2011) (quoting United States v. Lucien, 347 F.3d 45, 56-57 (2d Cir. 2003)). "This enhancement does not require actual injury, but it does require that the reckless risk was 'actual, not conjectural.'" United States v. Sosa-Baladron, 800 F. App'x 313, 330 (6th Cir. 2020) (quoting United States v. Vivit, 214 F.3d 908, 922 (7th Cir. 2000)), petition for cert. filed, No. 19-8703 (U.S. May 29, 2020).

Here, the government has not established either that there was a conscious risk, or a reckless risk that was actual, of death or serious bodily injury. Although the record here shows that the defendants knew they would be out of compliance with their approved HACCP plan, neither defendant was conscious of a risk of death or serious bodily injury. Nor was there a reckless risk that was actual of death or serious bodily harm.

In order for there to have been a reckless risk that was actual within the meaning of § 2B1.1(b)(16)(A) in this case, the defendants would have had to have known or had reason to know that there was a likelihood that contaminated meat would be coming out of the establishment. But the situation here is just

the opposite.  The defendants had a good faith basis for believing that it was unlikely that contaminated meat would be coming out of their plant because the establishment was maintaining sanitary conditions throughout its production processes.  So although their conduct is a deviation from what a reasonable person would do, it falls short of being a gross deviation.

The court agrees with the defendants that the case that is most analogous to the situation here is United States v. Benton, 323 F. Supp. 2d 903 (E.D. Wisc. June 17, 2004), a case involving a defendant's fraudulent assertion that three airplanes had undergone annual FAA inspections when they had not.  The court observed:

> Certainly, the FAA's inspection regime serves an important safety purpose.  But the mere fact that a plane was not inspected on time does not automatically mean that it has become dangerous.  By way of comparison, many states require periodic inspections of automobiles. It is a violation of law to operate a vehicle that is overdue for inspection.  However, a vehicle overdue for inspection is not necessarily unsafe.

Id. at 906.  The statement in the executive summary of the Food Safety Assessment in this case that, despite the findings, overall New England Meat Packing was maintaining sanitary conditions throughout the production processes should be viewed as the equivalent of a statement, in the context of Benton, by the FAA that the aircraft were all in good working order

notwithstanding the fact that they had not undergone the required annual inspections.

The court also finds helpful the observation in <u>Benton</u> that "[t]he evidence shows that defendant falsified the log books to save money--annual inspections can cost thousands of dollars-- not to cover up problems relating to the safety of the planes." <u>Id.</u> at 907.  Similarly, here, the defendants did not falsify the inspection reports to cover up problems relating to the safety of the establishment, but rather because they considered collecting and submitting all the required samples an inconvenience and a nuisance.

It is so ordered.

Dated this 1st day of October 2020, at Hartford, Connecticut.

/s/AWT
_____
Alvin W. Thompson
United States District Judge
